**GREGG & VALBY, L.L.P., Plaintiff,**

v.

**GREAT AMERICAN INSURANCE COMPANY, Defendant.**

No. CIV. H–02–2873.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 8, 2004.

Diana Elizabeth Marshall, The Marshall Law Firm, Houston, TX, for Gregg & Valby L L P, plaintiff.

Beth D Bradley, Thompson Coe et al, Dallas, TX, for Great American Insurance Company, defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION

LAKE, District Judge.

The Court has reviewed the Magistrate Judge's Memorandum and Recommendation and the objections and response thereto and is of the opinion that said Memorandum and Recommendation should be adopted by this Court.

It is, therefore, **ADJUDGED** that the Magistrate Judge's Memorandum and Recommendation is hereby **ADOPTED** by this Court.

1. This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and FED. R. CIV. P. 72. Docket Entry No. 8.

2. Docket Entry No. 14, Plaintiff's First Amended Complaint.

### MEMORANDUM AND RECOMMENDATION

JOHNSON, United States Magistrate Judge.

Pending before the court[1] is Defendant's Motion for Summary Judgment (Docket Entry No. 21), Plaintiff's Cross–Motion for Summary Judgment (Docket Entry No. 25), and Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence (Docket Entry No. 33). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Motion to Strike Summary Judgment Evidence be **DENIED**.

### I. Case Background

This is an insurance coverage dispute. Beginning in June 1997, Plaintiff purchased legal professional liability insurance coverage from Defendant and renewed such coverage on an annual basis.[2] In June 1999, Plaintiff renewed the previous year's policy, and was issued a new policy ("Policy") that was effective from June 28, 1999, through June 28, 2000.[3] This Policy, like its predecessors, required Defendant to pay all damages and claim expenses arising out of covered claims made against Plaintiff during the relevant policy period.[4]

On January 10, 2000, two class action lawsuits were filed in which Plaintiff was named a party defendant, *Aven, et al. v.*

3. Docket Entry No. 22, Exhibit B, Legal Professional Liability Claims–Made Form Policy No. LPL 145–20–97–02 ("Policy").

4. Policy, Part B.

*Emerald Funding Co. and Gregg & Valby, L.L.P.* ("*Aven* ") and *O'Sullivan, et al. v. Countrywide Home Loans, Inc. and Gregg & Valby* ("*O'Sullivan* ") (also referred to herein collectively as the "underlying suits").[5] In both of the underlying suits, home purchasers alleged that the settlement papers prepared in conjunction with their real estate closings misrepresented the amount of attorney's fees paid to Plaintiff.[6] On January 24, 2000, Plaintiff notified Defendant in writing of the two suits, requesting insurance coverage and the provision of a defense in the litigation.[7] On March 20, 2000, Defendant denied Plaintiff's request, concluding that the claims fell outside the coverage provided by the Policy.[8] As a result, Plaintiff utilized its own funds and provided its own defense in both suits.[9] Ultimately, Plaintiff was dismissed as a party from one of the lawsuits and settled in the other.[10]

On June 20, 2002, Plaintiff initiated this action in state court, seeking construction of the Policy and a declaration that Defendant had a duty to defend and indemnify it in the underlying suits.[11] Defendant properly removed the action to federal court on the basis of diversity jurisdiction.[12] Plaintiff filed its first amended complaint on April 29, 2003, asserting that Defendant had breached its duties to defend and indemnify under the Policy, breached the existing insurance contract, and violated certain provisions of the Texas Insurance Code.[13] Defendant moved for summary judgment on June 27, 2003, maintaining it had no duty to defend or indemnify and that Plaintiff's extra-contractual claims under the Texas Insurance Code were barred either by the applicable statute of limitations or otherwise precluded as a matter of law.[14] Shortly thereafter, Plaintiff filed a cross-motion for summary judgment, specifying in detail how the Policy covered the claims from the underlying suits.[15] Both motions are now before the court.

## II. *Summary Judgment Standard*

The standards for summary judgment are well established. Summary judgment is warranted only when the evidence before the court presents no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant must inform the court of the basis for the summary judgment motion by identifying relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, and affidavits that demonstrate the absence of genuine issues of material fact. FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). A material fact is one identified by

5. Docket Entry No. 25, Exhibit B, Plaintiffs' Original Class Action Complaint in the *Aven* suit; Exhibit C, Plaintiffs' Original Class Action Complaint in the *O'Sullivan* suit.

6. Docket Entry No. 25, Exhibits B, C.

7. Docket Entry No. 25, Exhibit D.

8. Docket Entry No. 22, Exhibit C.

9. Docket Entry No. 14.

10. Docket Entry No. 14.

11. Docket Entry No. 1, Exhibit B, Plaintiff's Original Petition.

12. Docket Entry No. 1, Defendant's Notice of Removal.

13. Docket Entry No. 14.

14. Docket Entry No. 21, Defendant Great American Insurance Company's Motion for Summary Judgment and Brief in Support.

15. Docket Entry No. 25, Plaintiff's Motion for Summary Judgment.

applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *Id.* at 250, 106 S.Ct. 2505.

If the moving party meets its burden, the nonmoving party must then go beyond the pleadings and produce competent evidence which establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party, however, must show more than "some metaphysical doubt as to the material facts." *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 81 (5th Cir.1995). Mere conclusory allegations, unsubstantiated assertions, or unsupported speculation will not carry this burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994).

When considering the evidence, the court resolves all doubts, and draws all reasonable inferences, in favor of the nonmoving party. *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir.2001). Where the record, taken as a whole, indicates that no reasonable jury could return a verdict for the nonmoving party, no genuine issue for trial exists, and summary judgment is a proper means of disposing of the issue. *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1286 (5th Cir.1990).

### III. *Applicable Law*

As this case is in federal court under diversity jurisdiction, state law governs substantive matters. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Because Texas is the forum state in this matter, the court applies its choice of law rules and substantive law.

*See* TEX. INS. CODE ANN. art. 21.42 (West 1998); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Guaranty Nat'l Ins. Co. v. Azrock Indus. Inc.*, 211 F.3d 239, 243 (5th Cir.2000).

### A. Burden of Proof and Contract Interpretation

In general, the insured bears the initial burden of establishing that there is coverage under an applicable insurance policy, while it is the insurer's burden to prove the applicability of an exclusion permitting it to deny coverage. *Venture Encoding Serv., Inc. v. Atl. Mut. Ins. Co.*, 107 S.W.3d 729, 733 (Tex.App.-Fort Worth 2003).

The construction of an insurance policy, like other written contracts, is a question of law to be determined by the court. *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995); *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983). Under Texas law, insurance policies are subject to the general rules of interpretation and construction applicable to contracts. *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex.2003); *Guaranty Nat'l*, 211 F.3d at 243. In construing the terms of a contract, the court's primary purpose is always to ascertain the true intent of the parties as expressed in the written instrument. *Mid–Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 158 (Tex.1999); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995); *Beaston*, 907 S.W.2d at 433. To this end, the court reads all provisions within the contract as a whole and gives effect to each term so that no part of the agreement is left without meaning. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998); *Beaston*, 907 S.W.2d at 433. Terms in contracts are given their plain, ordinary, and generally

accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning. *W. Reserve Life Ins. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557 (1953); *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 208–09 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

■■■ When a contract as worded can be given "a definite or certain legal meaning," then it is unambiguous as a matter of law and the court enforces it as written. *Nat'l Union*, 907 S.W.2d at 520. If, however, the policy is susceptible to more than one reasonable interpretation, the court must resolve the ambiguity in favor of the insured. *Progressive County*, 107 S.W.3d at 551 (quoting *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997)). Whether an ambiguity exists in the language of an insurance contract is a question of law for the court to determine. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). The court will not find a contract ambiguous, however, merely because the parties advance conflicting interpretations. *Id.* at 465.

## B. Duty to Defend

Under the "eight-corners" or "complaint allegation" rule, an insurer's duty to defend its insured arises if the insured is sued and the complaint alleges facts that potentially support claims for which there is coverage. *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997). The insurer must compare the four corners of the complaint with the four corners of the insurance policy to determine if the underlying allegations potentially fall within the coverage of the policy. *Id.* If the pleadings alone do not allege facts within the scope of coverage, the insurer is not legally required to defend the insured. *Id.; Am.*

*Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 847–48 (Tex.1994).

When applying the eight-corners rule, the court gives a liberal interpretation to the factual allegations contained in the complaint. *Nat'l Union*, 939 S.W.2d at 141. The allegations are considered in light of the insurance policy without regard to their truth or falsity. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973). In addition, all doubts regarding coverage are resolved in favor of the insured. *Nat'l Union*, 939 S.W.2d at 141 (citing *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (1965)). However, the court may not read facts into the pleadings, look outside the pleadings, or imagine factual scenarios that might trigger coverage. *Id.* at 142.

## C. Duty to Indemnify

Under Texas law, the duty to indemnify is narrower than the duty to defend. *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex.App.-Austin 1999, pet. denied); *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 368 (5th Cir.1998). It is triggered only by the actual facts establishing the insured's liability in the underlying litigation. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997). No duty to indemnify arises unless the underlying suit establishes liability for damages covered by the insuring agreement of the policy. *See Employers Cas. Co. v. Block*, 744 S.W.2d 940, 944 (Tex. 1988), *disapproved on other grounds by State Farm Fire & Cas. Co. v. Gandy*, 925 S.W.2d 696, 714 (Tex.1996); *see also Heyden Newport Chem.*, 387 S.W.2d at 25 (noting that the insurer pays because the insured "has been adjudicated to be legally responsible").

Further, the duty to indemnify is separate and distinct from the duty to defend.

*King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 187 (Tex.2002); *Farmers Tex. County Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82 (Tex.1997). In other words, an insurer may have a duty to defend but, eventually, no duty to indemnify. *Griffin,* 955 S.W.2d at 82.

### IV. *Legal Analysis*

In its motion for summary judgment, Defendant advances three reasons why it had no duty to provide insurance coverage, defend, or indemnify Plaintiff in the underlying suits: (1) no "claim" covered by the Policy was alleged against Plaintiff; (2) no covered "damages" were alleged; and (3) the Policy's "dishonest or intentional act" exclusion excluded coverage of the claims, if any, against Plaintiff.[16] In addition, Defendant argues that summary judgment in its favor is appropriate on the extra-contractual claims asserted by Plaintiff because such claims are either barred by the applicable statute of limitations or otherwise precluded as a matter of law.[17]

Plaintiff asserts in its cross-motion for summary judgment that: (1) the underlying claims arose out of Plaintiff's actions in providing professional services to a client, therefore triggering coverage under the Policy; (2) Defendant breached its duties to defend and indemnify; (3) Defendant breached the existing insurance contract; and (4) Defendant violated Section 21.21 of the Texas Insurance Code by denying coverage of Plaintiff's insurance claims in bad faith.[18]

### A. Was a covered "claim" alleged?

The court first determines whether the factual allegations in the underlying plead-ings stated a "claim" covered by the Policy. Defendant asserts that the pleadings in the two underlying suits did not state such a "claim".[19] As a result, Defendant argues, Policy coverage was never triggered and no duty arose to either defend or indemnify Plaintiff.[20] Plaintiff, on the other hand, contends that such a "claim" was in fact alleged against it.[21]

A close reading of the language employed in the Policy is key to resolution of this issue. Under the Policy, Defendant was required to "pay all Damages and Claim Expenses arising out of a Claim or Early Reported Incident" that Plaintiff became aware of and reported in writing during the Policy period.[22] The Policy set forth the following definitions relevant to the present dispute:

1. **Claim** means any demand received by you for money or services (a) arising out of your acts, errors or omissions in providing Professional Services; or (b) for Personal Injury arising out of your performance of Professional Services.

3. **Damages** means a monetary judgment, monetary award or monetary settlement which you are legally obligated to pay, but does not include punitive or exemplary damages, fines, penalties, court imposed monetary sanctions, or return or restitution of legal fees, costs and expenses.

10. **Professional Services** means services you perform for a client in your capacity as: (a) a lawyer; (b) a mediator or arbitrator; (c) a notary public; or (d) as an administrator, conserva-

16. Docket Entry No. 21.

17. Docket Entry No. 21.

18. Docket Entry No. 25.

19. Docket Entry No. 21.

20. Docket Entry No. 21.

21. Docket Entry No. 25.

22. Policy, Part B.

tor, executor, guardian, trustee, receiver, or in any similar fiduciary capacity, provided that such services are connected with and incidental to your profession as a lawyer.[23]

Thus, under the Policy, Defendant was required to provide coverage for claims "arising out of Plaintiff's acts, errors or omissions in providing Professional Services." The threshold issue for this court to determine, then, is whether such claim was ever asserted against Plaintiff in either of the two underlying suits.

### 1. The Underlying Suits

The two lawsuits forming the basis of this coverage dispute involved complaints made by various individual home buyers. The plaintiffs bought their homes through financing made available by mortgage lenders Emerald Funding, Ltd., and Countrywide Home Loans, Inc. Both lenders had previously hired Plaintiff to assist in the preparation and review of legal instruments used at closing, namely deeds, promissory notes, and deeds of trust.

At their respective closings, each of the plaintiffs received a HUD–1 Settlement Statement ("HUD–1") setting forth the various closing costs associated with their mortgage loan. One particular line on the plaintiffs' HUD–1 listed a "Document Preparation Fee" in the amount of $175.00 for legal services performed by Plaintiff.[24] The plaintiffs in both suits alleged that a portion of this fee was not, in fact, submitted to Plaintiff as indicated in the HUD–1,

but either retained by the lender (i.e., fee-splitting) or paid back to the lender by Plaintiff (i.e., kickback). In both suits it was established that Plaintiff had a long-standing arrangement with the lender whereby at each closing the borrower and/or seller paid the document preparation fee and the settlement agent disbursed a check for the fee to Plaintiff. Then, in a completely separate transaction, Plaintiff would send the lender a check for a portion of each document preparation fee collected during the month, representing payment for "clerical" services the lender provided in conjunction with the document preparation.[25] This arrangement between Plaintiff and its lender was not disclosed on any of the plaintiffs' HUD–1 Settlement Statements.

■ The plaintiffs in both the *Aven* and *O'Sullivan* suits alleged identical claims. One particular cause of action asserted that Plaintiff and its lender violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617 (2001). RESPA was enacted in order to ensure that home buyers would be provided with greater information on the nature and costs of the settlement process and to prevent unnecessarily high closing costs caused by certain abusive practices. 12 U.S.C. § 2601(a), (b). To this end, RESPA strictly prohibits kickbacks and fee-splitting between lenders and third parties involved in a real estate settlement. 12 U.S.C. § 2607(a), (b).[26] The home buyers'

---

23. Policy, Part A.

24. In the *Aven* suit, the plaintiff-borrowers paid the full $175.00 fee. Docket Entry No. 22, Exhibit N. In the *O'Sullivan* suit, the plaintiff-borrowers paid $175.00 while the seller paid an additional $50.00, for a total document preparation fee of $225.00. Docket Entry No. 31, Exhibit S.

25. *See* Docket Entry No. 31, Exhibit S.

26. 12 U.S.C. § 2607 provides, in pertinent part:

> (a) **Business referrals**-No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

RESPA claims alleged that Plaintiff violated the Act by either splitting the "Document Preparation Fee" between itself and its lender or by kicking back to the lender a portion of the fee "pursuant to an agreement" between the two parties.

The remaining three causes of action in both suits were also identical. In one cause of action, the plaintiffs' alleged that Plaintiff and its lender violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638(a)(2)(B)(iii), by not truthfully, clearly, and conspicuously disclosing on the HUD–1 the correct amount being paid by the lender to Plaintiff on the home buyers' behalf.[27] Another cause of action alleged the lender had engaged in the unauthorized practice of law by taking part in the preparation of legal instruments for a fee. The final cause of action accused Plaintiff and its lender of making negligent misrepresentations concerning information on the HUD–1.[28]

Defendant contends that all of the claims arose solely out of Plaintiff's billing and fee setting practices, i.e., its alleged misrepresentation of fees on the HUD–1. Setting fees and billing, Defendant maintains, do not require the specialized knowledge, training, or professional judgment necessary to constitute "professional services".[29]

Plaintiff argues in its motion for summary judgment that the claims in the underlying suits "involved two different types of legal work: (1) the drafting of legal documents and the determination of how the drafting was to be accomplished; and (2) the advice to clients on the legality of and the legal issues involved in a particular practice."[30] Plaintiff made essentially the same argument in its response to Defendant's motion, asserting that the claims were based on "the preparation of document forms, the review of individual documents, assistance in the creation of a document preparation system and advising on the manner of charges for the above work."[31]

A party's particular characterization of a claim cannot conceal its true nature. *Tacon Mech. Contractors, Inc. v. Aetna Cas. & Sur. Co.*, 65 F.3d 486, 488 (5th Cir.1995) ("[F]ederal summary judgment procedure requires us to pierce through the pleadings and their adroit craftsmanship to reach the substance of the claims."). After careful consideration, the court agrees with Defendant and concludes that the only acts of Plaintiff at issue in the underlying suits were its fee-setting and billing practices. More specifically, the complaints only concerned Plaintiff's alleged misrepresenta-

---

(b) **Splitting charges**-No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of any real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

27. The *Aven* plaintiffs subsequently dropped the TILA claim against Plaintiff in their first amended complaint. However, the amended complaint was filed on March 21, 2000, after Defendant had denied insurance coverage in its letter dated March 20, 2000. Therefore, in deciding whether the underlying suits alleged a "claim" as contemplated by the Policy, giv-

ing rise to a duty to defend, the court looks at the claims asserted against Plaintiff in the original complaint.

28. Similar to the TILA claim, the negligent misrepresentation claim against Plaintiff was also dropped in the first amended complaint. Thus, the first amended complaint charged Plaintiff only with violations of RESPA.

29. Docket Entry No. 21.

30. Docket Entry No. 25.

31. Docket Entry No. 28, Gregg & Valby's Response to Defendant's Motion for Summary Judgment.

tion of the legal fee on the HUD–1 and its alleged kickback or splitting of that fee. The plaintiffs in the underlying suits did not, as Plaintiff would have this court believe, complain about any legal work or advice Plaintiff provided. Moreover, the home buyers did not complain about the amount of the "Document Preparation Fee," nor its existence, but only what happened to that fee after it was paid at closing.

### 2. Professional Services

The next issue for the court to determine is whether Plaintiff's billing and fee-setting practices are considered "professional services" triggering coverage under the Policy.

In *Atlantic Lloyd's Insurance Co. of Texas v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472 (Tex.App.-Dallas 1998, pet. denied), the court provided a thorough description of what constitutes a "professional service" in the context of insurance contracts:

> [I]t is clear that a professional must perform more than an ordinary task to perform a professional service. To qualify as a professional service, the task must arise out of acts particular to the individual's specialized vocation. We do not deem an act a professional service merely because it is performed by a professional. Rather, it must be necessary for the professional to use his specialized knowledge or training.

*Id.* at 476–77. Other courts have espoused virtually identical definitions. *See, e.g., Duncanville Diagnostic Ctr., Inc. v. Atlantic Lloyd's Ins. Co. of Tex.*, 875 S.W.2d 788, 790 (Tex.App.-Eastland 1994, writ denied) ("[A] profession involves labor, skill, education, special knowledge and compensation or profit."); *Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 514–17 (1st Cir.1998)

(" '[P]rofessional services' ... embrace those activities that distinguish a particular occupation from other occupations—as evidenced by the need for specialized learning or training—and from the ordinary activities of life and business."); *Visiting Nurse Ass'n of Greater Phila. v. St. Paul Fire & Marine Ins. Co.*, 65 F.3d 1097, 1101 (3rd Cir.1995) (quoting *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 984–85 (3rd Cir.1988)) ("A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill.").

Professional services are "those acts which use the inherent skills *typified* by that profession, not *all* acts associated with the profession." *Atlantic Lloyd's*, 982 S.W.2d at 477 (emphasis in original). When determining whether a particular act is a "professional service," the court "must look not to the title or character of the party performing the act, but the act itself." *Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 157 N.W.2d 870, 871–72 (1968). Thus, even tasks performed by lawyers are not considered "professional services" if they are ordinary activities that can be completed by those lacking legal knowledge and skill. *See Atlantic Lloyd's*, 982 S.W.2d at 476–77.

### 3. Billing and Fee-setting

With these criteria in mind, the court has little trouble concluding that Plaintiff's billing and fee-setting practices are not "professional services". Contrary to Plaintiff's conclusory contentions, nothing suggests that billing or fee-setting require specialized legal skill and knowledge, nor are they acts particular to the legal profession. *See Med. Records Assocs.*, 142 F.3d 512 ("Indeed, setting a price for services and sending bills are functions of every business...."). Simply put, they are

merely administrative tasks inherent to all businesses. *See Visiting Nurse Ass'n*, 65 F.3d at 1101 (recognizing the billing/professional services dichotomy, and classifying the act of billing as a commercial, rather than professional, aspect of practicing law).

This court's determination that billing and fee-setting are not "professional services" is in accord with the opinions of other courts that have considered the issue. For instance, in a recent Massachusetts case, *Reliance National Insurance Co. v. Sears, Roebuck & Co.*, 58 Mass.App. Ct. 645, 792 N.E.2d 145 (2003), an attorney sought coverage under a professional liability insurance policy for a claim brought against him alleging he had fraudulently billed for attorney's fees. The court held that the attorney's billing practice was not part of his professional legal services and, therefore, that the underlying claim was not covered by his insurance policy:

> [w]e decide that the billing function of a lawyer is not a professional service. Billing for legal services does not draw on special learning acquired through rigorous intellectual training. We are not aware that courses in billing clients appear in law school curricula. The billing function is largely ministerial. There are elements of experience and judgment in billing for legal services, but the same goes for pricing shoes. As billing is not a professional service, it does not come within the coverage of a professional liability insurance policy.

*Id.* at 148. This court also finds instructive the reasoning employed in another case with similar circumstances, *PMI Mortgage Insurance Co. v. American International Specialty Lines Insurance Co.*, 2002 WL 32065867 (N.D.Cal.2002). In that decision, PMI, a company providing insurance to real estate lenders, was sued by a putative class of plaintiffs alleging it

had violated RESPA by undercharging its lenders in exchange for referrals on mortgage insurance. *Id.* at *1. The court determined that PMI's billing was not a "professional service" because such act was only incidental to the real estate services PMI provided to its clients. *Id.* at *2. Because the underlying claim was based solely on PMI's billing practice, i.e., undercharging its clients, and not from any alleged professional malpractice, the court found it was not covered by PMI's insurance policy. *Id.*

In addition to these two decisions, courts have also concluded outside the legal context that billing and fee-setting are not professional services. For example, in *Medical Records Associates*, the First Circuit Court of Appeals held that setting a fee for photocopies of medical records was not part of the "professional services" provided by a medical records processing company but, instead, was merely a generic business practice. 142 F.3d at 514–17. The court pointed out that fee-setting and billing did not require any specialized learning or training and that, "[a]s in most other businesses, the bill is an effect of the service provided, not part of the service itself." *Id.* at 515–16. Similarly, in *Jerome Group, Inc. v. Cincinnati Insurance Co.*, 257 F.Supp.2d 1217, 1223–25 (E.D.Mo. 2003), the court held that billing was not part of the professional printing services provided by the insured printing company and was, therefore, not covered by the insured's professional liability insurance policy. In addition, in *Horizon West Inc. v. St. Paul Fire & Marine Insurance Co.*, 214 F.Supp.2d 1074, 1078–79 (E.D.Cal. 2002), the underlying suit alleged that the insured nursing home submitted fraudulent claims to Medicare and Medicaid for services it did not provide. The court rejected the nursing home's argument that its billing activities constituted professional services covered by the policy, stating that

billing was only an effect of the professional medical services the home provided, not part of the services itself. *Id.*

Plaintiff argues that its determination of the document preparation fee required legal skill and knowledge of real estate law and, therefore, was a "professional service".[32] Plaintiff also maintains it had to research pertinent provisions of state and federal law before advising its lender clients as to the legality of the document preparation arrangement. Plaintiff directs the court to two legal opinion letters written to its clients in which it analyzed whether the arrangement with the lender was legally viable.[33] These letters, Plaintiff maintains, "clearly involved legal research and examination" and therefore demonstrate that the claims in the underlying suits were based on its professional services. Plaintiff's argument misses the point. The plaintiffs in the underlying suits did not complain of any legal advice Plaintiff gave its clients in the letters. There were no complaints that Plaintiff committed malpractice. *See Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 481 (Tex.App.-Dallas 1995, writ denied) ("A cause of action for legal malpractice arises out of an attorney's bad legal advice or improper representation."). Instead, the claims in the underlying suits complained of Plaintiff's billing practice as manifested through the fee on the HUD–1 Settlement Statement and the document preparation arrangement. As specified above, a party's characterization of a claim cannot conceal its true nature. *Tacon Mech. Contractors*, 65 F.3d at 488. The court finds no merit to Plaintiff's contentions in this regard.

Based on the court's conclusion that billing and setting fees are not acts constituting "professional services," as well as the court's determination that all claims in the underlying suits arose out of Plaintiff's billing and/or fee-setting, it becomes clear that no "claim," as defined by the Policy, was ever alleged against Plaintiff. Plaintiff therefore did not meet its burden of establishing an entitlement to coverage. Consequently, Defendant had no duty to defend Plaintiff and did not breach the insurance contract by denying coverage.

Further, because Defendant did not have a duty to defend, it also had no duty to indemnify Plaintiff for any expenses Plaintiff incurred as a result of the two suits. *Bailey*, 133 F.3d at 368 ("Logic and common sense dictate that if there is no duty to defend, then there must be no duty to indemnify.").

Because the court's conclusions entitle Defendant to judgment as a matter of law, it will not consider the parties' remaining arguments regarding Policy coverage.

## B. Plaintiff's Texas Insurance Code Claim

■ Plaintiff also brings an extra-contractual claim, alleging that Defendant denied its insurance claims in bad faith, thereby violating Article 21.21 of the Texas Insurance Code. However, under Texas law, an extra-contractual claim alleging that an insurer denied coverage in bad faith is barred when the claim is in fact not covered. *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex.1995). As a result, because Defendant had no duty to provide coverage under the Policy, Plaintiff's extra-contractual claim is barred.

## C. Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence

Also pending before the court is Defendant's Motion to Strike Plaintiff's Sum-

---

**32.** Docket Entry Nos. 28, 35.

**33.** Docket Entry No. 35, Exhibit C.

mary Judgment Evidence (Docket Entry No. 33). The motion is denied. In reaching the above-stated conclusions, the court did not rely on any summary judgment evidence submitted by Plaintiff it deemed incompetent or inadmissible.

## IV. *Conclusion*

Based on the foregoing, the court **RECOMMENDS** that Defendant's Motion for Summary Judgment be **GRANTED**, Plaintiff's Motion for Summary Judgment be **DENIED**, and Defendant's Motion to Strike Summary Judgment Evidence be **DENIED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties, who have ten days from the receipt thereof to file written objections thereto pursuant to General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas, 77002.

December 12, 2003.