# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PMI MORTGAGE INSURANCE CO.,
        *Plaintiff-Appellant,*

        v.

AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
COMPANY; FEDERAL INSURANCE
COMPANY; and COLUMBIA CASUALTY
COMPANY,
        *Defendants-Appellees.*

Nos. 03-15728
03-16007

D.C. No.
CV-02-1774 PJH

ORDER
AMENDING
OPINION AND
DENYING
PETITIONS FOR
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 5, 2004—San Francisco, California

Filed January 14, 2005
Amended March 10, 2005

Before: Richard D. Cudahy,* Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Cudahy

---

*The Honorable Richard D. Cudahy, Senior Circuit Judge for the
United States Court of Appeals for the Seventh Circuit, sitting by designation.

**COUNSEL**

David B. Goodwin and Warrington S. Parker III, Heller Ehrman White & McAuliffe LLP, San Francisco, California, for the plaintiff-appellant.

Mark G. Bonino, Ropers, Majeski, Kohn & Bentley, San Francisco, California, and H. Paul Breslin, Archer Norris, Walnut Creek, California, for the defendants-appellees.

**ORDER**

The opinion filed on January 14, 2005, is amended as follows:

On slip opinion page 703, last line, insert "partial" between "enter" and "summary judgment."

With this amendment, Appellee American International Specialty Lines Insurance Company's Petition for Rehearing or, in the Alternative, for Certification of the Controlling Issue to the California Supreme Court and Appellees Columbia Casualty Company and Federal Insurance Company's Petition for Panel Rehearing are DENIED. No further petitions for rehearing may be filed.

---

## OPINION

CUDAHY, Circuit Judge:

## I.  BACKGROUND

PMI is a large financial institution that sells, among other things, mortgage guaranty insurance to residential mortgage lenders who provide loans to homebuyers considered to be at risk of defaulting on their mortgages. This insurance covers a lender for losses incurred when a borrower defaults on the repayment of a mortgage loan and the collateral is not sufficient to make the lender whole. PMI also offers its lender clients underwriting services, claims services, policy administration services, loan underwriting, loss mitigation, pool insurance and captive reinsurance.

In December 1999, a putative class of plaintiffs who had obtained mortgage insurance through PMI's lender clients sued PMI in the Southern District of Georgia (The *Baynham* action). The Third Amended Class Complaint alleged that PMI was undercharging its lender clients for various insurance products and services in exchange for customer referrals on mortgage insurance. Since the lender clients had not passed these savings on to their customers, plaintiffs claimed

that this scheme violated the anti-kickback provisions of the Real Estate Settlement Procedures Act (RESPA).

The *Baynham* complaint also alleged that "[n]one of the loan documents or disclosures given to the borrower[s] disclose[s] that part of the charges paid by borrowers are compensation to the Defendant [PMI] for the discounts accorded to the lenders on its various products and services, nor disclose the tainted nature of Defendant's relationship with the lender," also in violation of RESPA.[1] While PMI was formally charged only with violating RESPA's anti-kickback provisions, the complaint also asserts that PMI "acted in concert with its lenders to violate . . . [the] duty to disclose." The *Baynham* lawsuit was settled in June 2001 for $10 million.

When the *Baynham* action arose, PMI held a Financial Institution Professional Liability Insurance Policy issued by American International Specialty Lines Insurance Company (AISLIC), which required AISLIC to pay PMI up to $10 million for any loss covered by the policy. PMI had also purchased layers of excess coverage from Columbia Casualty Company (Columbia) and Federal Insurance Company (Federal), which obligate these insurers to cover PMI on terms identical to those of the AISLIC policy once the limits of AISLIC liability have been exhausted. These excess policies provide that Columbia will pay 30% and Federal will pay 40% of any losses between $10 million and $20 million.[2]

---

[1]Section 2607 of RESPA prohibits the transfer of a "fee, kickback, or thing of value" in exchange for referrals in connection with real estate settlement services, unless the fee or "thing of value" is given for bona fide services actually performed *and* this fee-for-services arrangement is fully disclosed. 12 U.S.C. § 2607.

[2]As PMI notes, a third insurer, Reliance, also issued PMI an excess coverage policy and was to cover the final 30% of all losses between $10 million and $20 million. However, Reliance has since become insolvent and thus is not a party to this case.

The AISLIC insurance policy provides that AISLIC (and hence Columbia and Federal as well) will indemnify PMI for "the Loss of the Insured arising from a Claim . . . for *any actual or alleged Wrongful Act of any Insured in the rendering or failure to render Professional Services.*" (Emphasis added.) The policy defines "Wrongful Act" as "any act, error or omission in the rendering of or failure to render Professional Services." The policy defines "Professional Services" as follows:

> [T]hose services of the Company permitted by law or regulation rendered by an Insured . . . pursuant to an agreement with the customer or client as long as such service is rendered for or on behalf of a customer or client of the Company: (i) in return for a fee, commission or other compensation . . . or (ii) without Compensation as long as such non-compensated services are rendered in conjunction with services rendered for Compensation.

On April 15, 2002, PMI filed a breach of contract and declaratory relief action against AISLIC, Federal and Columbia (the Insurers) alleging that the losses incurred in the *Baynham* action were covered by the Professional Liability policy issued by AISLIC and, thus, that the Insurers had a legal duty to indemnify PMI for its losses.[3] AISLIC denied that PMI's losses arose from the rendering of professional services as required by the policy, and it made a counterclaim seeking repayment of legal defense costs it had previously advanced to PMI (totaling some $1.4 million).

Both parties moved for summary judgment on the question whether PMI's alleged violations of RESPA in the *Baynham* action were "Wrongful Acts" committed "in the rendering of

---

[3]Since PMI's total losses in connection with the *Baynham* suit exceeded $10 million, PMI alleged that Columbia and Federal each had a duty to indemnify PMI as well.

. . . Professional Services" as required by the AISLIC policy. In its December 16, 2002 Order, the district court granted AISLIC summary judgment, ruling that PMI's actions giving rise to the *Baynham* action were fundamentally administrative and thus did not constitute professional malpractice or involve the rendering of "Professional Services" as required by the insurance policy. *See PMI Mortgage Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.,* No. C-02-1774, 2002 WL 32065867 (N.D. Cal. Dec. 16, 2002)

On March 19, 2003, the district court dismissed PMI's complaint with prejudice and entered judgment in favor of AISLIC in the amount of $1.445 million. PMI timely filed a Notice of Appeal from the judgment on April 10, 2003.

On May 19, 2003, the district court entered summary judgment in favor of Columbia and Federal as well, dismissing PMI's complaint against both parties with prejudice. On May 21, 2003, PMI filed an appeal from the judgment in favor of Columbia and Federal, as well as an appeal from the earlier judgment in favor of AISLIC. On June 9, 2003, this Court granted PMI's motion to consolidate these appeals. This Court is now called upon to review the district court's grants of summary judgment in favor of AISLIC, Columbia and Federal.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over these consolidated appeals pursuant to 28 U.S.C. § 1291, which provides for appellate review of final orders issued by the district courts, including grants of summary judgment. Rulings on motions for summary judgment are reviewed *de novo*. *Suzuki Motor Corp. v. Consumers Union of the United States, Inc.*, 330 F.3d 1127, 1131 (9th Cir.), *cert. denied*, 540 U.S. 983 (2003)*; King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 963 (9th Cir. 2003). Summary judgment should be granted when "there is no genuine issue as to any material fact" and "the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); s*ee also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

## III.   DISCUSSION

The sole question before us is whether PMI's alleged violations of RESPA, as presented in the *Baynham* action, were "Wrongful Acts" committed "in the rendering of . . . Professional Services" under the AISLIC policy. The district court answered this query in the negative, granting the Insurers' motion for summary judgment. Having reviewed both the text of the contested policy and the relevant case law, we are convinced that this disposition was erroneous. The plain language of the PMI policy and the basic principles of insurance policy interpretation under California law support a finding of coverage, and the implications of prevailing case law on professional malpractice policies — while interesting but only indirectly relevant — do not compel a contrary result. Additionally, the fact that the *Baynham* claim alleges a RESPA violation, while not determinative, bolsters this conclusion. We therefore reverse.

### A.   *Interpretation of the Policy Text*

[1] In resolving this constructional dispute, the lodestar of our analysis must be the mutual intent of the parties as expressed in the provisions of the insurance policy itself. Under California law, which governs this diversity action, courts must construe insurance policy terms so as to give effect to the "mutual intention" of the parties at the time the policy was issued, and this intent should be inferred, to the extent possible, "*solely from the written provisions of the [policy] contract.*" *MacKinnon v. Truck Ins. Exch.,* 73 P.3d 1205, 1212-13 (Cal. 2003) (emphasis added) (internal quotation marks omitted); *see also Bank of the W. v. Superior Court*, 833 P.2d 545, 551-52 (Cal. 1992) (same); *AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990) (same).

Neither party disputes the applicability of this basic directive to the instant case. Accordingly, we begin our inquiry with a consideration of the policy text itself, mindful that the insured party generally bears the initial burden of demonstrating that the claim is "within the basic scope of coverage." *Waller v. Truck Ins. Exch.*, *Inc.*, 900 P.2d 619, 625 (Cal. 1995) (internal quotation marks omitted).

[2] Turning then to the policy language at issue, the PMI policy defines "Professional Services" simply as "*those services of the Company permitted by law or regulation rendered by an Insured . . . pursuant to an agreement with the customer or client*." (Emphasis added.) From a strictly textualist perspective, PMI's alleged kickback scheme and the resulting *Baynham* action clearly fall within this broad provision, as they resulted directly from PMI's provision of mortgage insurance "services" under various (allegedly improper) "agreements" with lender "clients." The plain meaning of the policy language thus does encompass PMI's alleged misconduct.[4]

[3] Of course, one could argue that it may not be appropriate to take this broad policy language at face value. While the bare text of the policy ostensibly covers *all* "services" rendered "pursuant to an agreement" with a customer or client, the policy's use of the term "Professional Services" (as opposed to merely "services") does invoke a traditional professional malpractice vocabulary, and the policy is actually titled "Financial Institution *Professional* Liability Insurance Policy." (Emphasis added.) But even assuming, *arguendo,* that these considerations bear on this case, California law

---

[4]Insurers note that "ambiguous language is construed against the party who caused the uncertainty to exist." *See AIU Ins. Co. v. Superior Court*, 799 P.2d 1253, 1264 (Cal. 1990). Yet even conceding that this principle applies here, it actually cuts against the Insurers. The Insurers drafted the policy, and so to the extent that it is found to be ambiguous, responsibility for the ambiguity lies with them, not with PMI.

instructs that such interpretive quandaries be resolved in favor of the insured and against the insurer. The California Supreme Court has consistently held that insurance policies are to be "interpreted broadly so as to afford the greatest possible protection to the insured."[5] *MacKinnon*, 73 P.3d at 1213 (internal quotation marks omitted); *see also White v. W. Title Ins. Co.,* 710 P.2d 309, 313 (Cal. 1985) ("Any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer . . . .") (internal quotation marks omitted). The California Supreme Court has explained this constructional policy as follows: "The purpose of this canon of construction is to protect the insured's reasonable expectation of coverage in a situation in which the insurer-draftsman controls the language of the policy." *Id.* at 313.[6]

---

[5]PMI cites another passage from *MacKinnon* which states the rule governing exclusionary terms:

> [W]e are not required . . . to select one "correct" interpretation from the variety of suggested readings. . . . [W]e need not determine that the two interpretations proposed by the insurer are not possible, or even reasonable, interpretations of the clause in question. . . . Instead, even assuming that the insurer's suggestions are reasonable interpretations which would bar recovery by the claimants, we must nonetheless . . . find[ ] . . . coverage so long as there is any other reasonable interpretation under which recovery would be permitted in the instant cases.

*MacKinnon*, 73 P.2d at 1218 (internal quotation marks omitted). PMI seems to rely on this passage for its arguments about California interpretive rules, but this reliance is misplaced. This passage in *MacKinnon* addresses *exclusionary* clauses specifically. While the prevailing rule as to ordinary coverage provisions also favors the insured over the insurer, it is substantially less stringent than the rule cited here, which is specific to exclusionary clauses.

[6]This interpretive approach applies with special force when the insurance company's duty to defend the insured against a lawsuit is at issue. A federal district court applying California law has recently ruled that " '[u]nder California law, the duty to defend is so broad that as long as the complaint contains language creating the potential of liability under an insurance policy, the insurer must defend an action against its insured.' " *Horizon W., Inc. v. St. Paul Fire & Marine Ins. Co.*, 214 F. Supp. 2d 1074,

**[4]** The plain meaning of the policy text and the applicable canons of construction under California law thus point us in the same direction — they both militate in favor of finding coverage for PMI.

### B. *The Case Law on Professional Malpractice Insurance*

Since our primary analytical considerations under California law — the plain language of the PMI policy and the canons of interpretation applicable to insurance policy contracts — both demand a finding of coverage, we need proceed no further. However, since the district court ultimately arrived at the opposite conclusion via a different analysis, it is appropriate to address the disposition below on its own terms.

**[5]** Confronted with the PMI policy's strikingly broad definition of "Professional Services," the district court turned to leading judicial constructions of that term in traditional professional malpractice policies. 2002 WL 32065867, at *1. The most authoritative construction of the term "professional services" as used in the malpractice insurance setting was made by the Ninth Circuit in *Bank of California, N.A. v. Opie*:

> "Something more than an act flowing from mere employment or vocation is essential. . . . A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual . . . . In deter-

1076 (E.D. Cal. 2002) (quoting *Zurich Ins. Co. v. Killer Music, Inc.*, 998 F.2d 674, 678 (9th Cir. 1993)). Under this rule "[a]ny doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor" such that, an insured seeking legal defense coverage "need only show that the underlying claim may fall within policy coverage." *Id.* (internal quotations marks omitted).

mining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself."

663 F.2d 977, 981 (9th Cir. 1981) (quoting *Marx v. Hartford Accident & Indem. Co.*, 157 N.W.2d 870, 871-72 (Neb. 1968)). To be considered a "professional service" for insurance purposes, a liability "must arise out of the special risks inherent in the practice of the profession." *Id*. This standard has been cited with approval by several courts across the country, including a California federal district court applying California law. *See, e.g., Pac. Ins. Co. v. Burnet Title, Inc.*, 380 F.3d 1061, 1064-65 (8th Cir. 2004) (applying a similar standard); *Med. Records Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.,* 142 F.3d 512, 514 (1st Cir. 1998) (applying the same standard); *Horizon W., Inc. v. St. Paul Fire & Marine Ins. Co.*, 214 F. Supp. 2d 1074, 1078 (E.D. Cal. 2002) (applying California law and adopting the *Opie* standard).

[6] In keeping with this general rule, California state courts have uniformly held that insurance policies covering "professional services" reach only those acts committed by the insured in his or her capacity as a professional — they do not cover general administrative activities that occur in all types of businesses. For example, *Inglewood Radiology Medical Group, Inc. v. Hospital Shared Services*, *Inc.,* held that professional malpractice insurance does not cover a lawsuit concerning a physician's decision to fire an employee, even though the physician's professional medical knowledge was required to make employment evaluations. 266 Cal. Rptr. 501, 503 (Ct. App. 1989) ("[T]he decision to terminate employment is a business or administrative decision. In making such a decision, the physician is acting as an employer and not as a 'physician rendering services.' "). Similarly, *Blumberg v. Guarantee Insurance Co.* held that professional malpractice insurance does not cover a lawsuit between attorneys over an alleged breach of their partnership agreement since, in bring-

ing the suit, the plaintiff was acting in his capacity as a law partner, not as an attorney rendering services. 238 Cal. Rptr. 36, 39 (Ct. App. 1987). *TransAmerica Insurance Co. v. Sayble* held that professional malpractice insurance did not cover litigation expenses arising from an attorney's alleged mismanagement of a law firm. 239 Cal. Rptr. 201, 205 (Ct. App. 1987). Since the case was held to concern essentially a business dispute, it did not implicate the defendant's professional activities as an attorney. At least one California court has held that, in such cases, the dispositive question is whether the alleged injuries occurred "during the performance of professional services." *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 118 Cal. Rptr. 2d 561, 568 (Ct. App. 2002).

In applying these precedents to the case at bar, the district court characterized PMI's alleged kickback scheme and disclosure failures as a "[b]illing" matter involving "undercharging its clients for . . . products and services." 2002 WL 32065867, at *2. It cites *Medical Records* for the proposition that "the bill is an effect of the service provided, not part of the service itself." 142 F.3d at 516. Insurers also cite several cases that establish the general proposition that "claims regarding the amount of fees charged for professional services are not covered under professional liability policies."[7] This conclusion, anchored in an unqualified analogy between the PMI policy and traditional professional malpractice policies, is flawed.

---

[7]In addition to *Medical Records*, 142 F.3d at 515-16 ("we fail to see how setting a price for photocopies and producing accurate invoices are other than generic business practices"), Insurers also cite *Cohen v. Empire Casualty Co.,* where the Colorado Supreme Court held that one attorney's failure to pay another for services rendered was not covered by a professional liability policy. 771 P.2d 29 (Colo. Ct. App. 1989). Insurers also cite *National Union Fire Ins. Co. v. Shane & Shane Co.,* in which an Ohio appeals court ruled that an attorney's alleged overcharging of a personal injury client, beyond what was provided for in his contingency fee contract, was also not covered by the attorney's professional liability policy. 605 N.E.2d 1325 (Ohio Ct. App. 1992).

**[7]** It should be observed, first, that PMI is a major financial institution whose core lines of business include, among other things, the sale of mortgage insurance. PMI is not engaged in one of the traditional "professions" as that term is commonly understood, and it does not render the physical or intellectual acts of service one commonly associates with doctors or lawyers. Additionally, it is important to note that the PMI policy language is significantly broader than the language at issue in any of the aforementioned professional malpractice insurance cases. The professional malpractice policies in virtually all of those cases define "professional services" narrowly, explicitly limiting coverage to acts performed by the insured *in its professional capacity. See, e.g., Johnson v. First State Ins. Co.*, 33 Cal. Rptr. 2d 163, 165 (Ct. App. 1994) ("Professional Services" defined as "all services rendered or which should have been rendered for others: 1. by the Insured <u>in the Insured's capacity as a lawyer</u>, notary administrator of an estate . . . .") (emphasis added); *Sayble*, 239 Cal. Rptr. at 203 n.2 ("Professional Services" defined as "all services rendered or which should have been rendered *for others*: 1. *By the Insured in the Insured's capacity as a lawyer* . . . .") (underscore emphasis added); *Inglewood Radiology*, 266 Cal. Rptr. at 502 ("professional services" defined as those "services *performed in the practice of the profession of a physician*") (emphasis added); *Blumberg*, 238 Cal. Rptr. at 37 (policy covers claims "arising out of . . . any acts or omissions of the Insured in rendering or failing to render professional services *for others . . . in the Insured's capacity as a lawyer*") (emphasis in original). The PMI policy does not contain any such explicit restriction and thus is distinguishable from the policies analyzed in these cases. A policy that uses the buzzwords "professional services," but then proceeds to define them more broadly than most standard malpractice policies, should certainly be read differently than policies containing narrower language.

But even to the extent that the aforementioned "malpractice" precedents are indirectly relevant here — PMI's core

business does, after all, involve "specialized knowledge" and expertise — it is not clear that they favor the Insurers. PMI *was* acting in its professional capacity as a mortgage lender, and within the context of its specialized relationships with its lender-clients, when the alleged improper conduct occurred. While the kickback scheme at issue does involve the valuation or pricing of services, PMI has not been charged merely with sending customers inflated invoices. It has been accused of participating in an ongoing collusive scheme under which it received customer referrals in exchange for undercharging lender clients for its services. And while PMI was not formally charged with disclosure violations under RESPA, the *Baynham* plaintiffs alleged that PMI "acted in concert with its lenders to violate Regulation X [of RESPA] which specifically imposes a duty to disclose . . . the nature of the relationship between the lender and a required service provider."[8] This alleged kickback scheme goes to the heart of PMI's business. It implicates the way in which it finds and serves its customers, the business opportunities that it enjoys and the network of professional relationships through which it operates.[9] This alleged behavior is a far cry from more conventional administrative "pricing" decisions or improper "billing" practices.

**[8]** In short, even assuming, *arguendo*, that we may look

---

[8]It bears repeating that such alleged misconduct is sufficient to trigger coverage under the policy, which indemnified PMI for losses "arising from a Claim . . . for any *actual or alleged* Wrongful Act of any Insured in the rendering or failure to render Professional services." (Emphasis added.)

[9]While we agree that an elaborate kickback scheme such as the one alleged here is fundamentally different from merely issuing inflated invoices, we disagree with PMI's broader assertion that the issue of valuation can *never* be separated from the rendering of insurance services. Several courts have convincingly distinguished between billing practices and professional services in other industries, and we see no reason why this distinction might not apply to the insurance industry under a different set of facts.

beyond the text of the PMI policy in resolving this case, Insurers find little support in California case law on professional malpractice policies, which apply narrower policy language to professional conduct fundamentally different from that at issue here. The district court's invocation of these precedents to characterize PMI's alleged kickback scheme as merely an administrative or "billing" matter was erroneous.

## C.  *The Implications of RESPA*

**[9]** One additional factor militates in favor of finding coverage in this case — the fact that the losses at issue stem from a claim under the Real Estate Settlement Procedures Act (RESPA). Section 2607 of RESPA places certain requirements on parties who make referrals or provide certain services in connection with real estate transactions. 12 U.S.C. § 2607(c). Among other things, RESPA requires that parties making referrals disclose their relationship with the entity receiving the referral, and that parties involved in real estate transactions price their services properly. *Id.* Entities involved in real estate transactions can be exposed to liability under RESPA for failure to meet these requirements, even if such failure is innocent or unintentional. *Id.* To invoke the terminology of the *Opie* court, RESPA's liability provisions undoubtedly represent one of the "special risks inherent in the practice of" the mortgage insurance business or profession. *See Opie*, 663 F.3d at 981.

Insurers challenge the notion that professional liability policies must be interpreted to cover RESPA claims, and the district court asserts that the mere fact of federal regulation cannot transform all activities in a regulated industry into insurable "professional services." 2002 WL 32065867, at *2. PMI counters by claiming that "RESPA uniquely applies to those in the residential real estate business, requires specific actions and uniquely exposes such a business to possible suit, however unfounded, should it fail to make all disclosures required or should it allegedly misvalue its services." Based

on this contention, PMI argues that, as a unique risk inherent to its specific professional industry, RESPA suits should be presumptively covered by general professional liability policies. PMI goes on to assert that excluding RESPA claims from its policy coverage would both violate its expectations in purchasing the insurance and remove one of its major motivations in seeking professional liability insurance in the first place.

This characterization might be dismissed as partisan and self-serving except that two federal courts recently have endorsed this very position. The first such case is *Nowacki v. Federated Realty Group*, *Inc.*, which holds that a professional liability policy covering "any negligent act, error or omission in the rendering or failure to render, professional services" covers losses stemming from a RESPA action that alleged the insured (a real estate broker) participated with a title insurance company in an illegal referral scheme. 36 F. Supp. 2d 1099, 1105 (E.D. Wis. 1999). This case is doubly on point because it involves not only the construction of a professional liability policy with respect to a RESPA claim, but also an alleged illegal referral scheme and a failure to make required disclosures.

Insurers attempt to distinguish *Nowacki* by observing that the insurance broker in that case was sued by its own clients for misconduct in the rendering of services directly to those clients. Yet this argument is easily dealt with. The PMI policy's coverage does not depend on the status of the *Baynham* plaintiffs, or their relationship to PMI — the policy merely requires that losses stem from a rendering of "Professional Services" to some "customer or client" pursuant to an "agreement." The *Baynham* action resulted directly from PMI's rendering of services to its lender clients pursuant to specific business agreements. The exact relationship of the ultimate plaintiffs with PMI is not relevant.

More recently, the court in *Pacific Insurance Co. v. Burnet Title*, 380 F.3d 1061 (8th Cir. 2004), likewise held that

RESPA violations fall within the ambit of professional liability policies. In *Burnet Title*, the court held that a class action complaint against a real estate firm accused of overcharging clients and failing to disclose material information in violation of RESPA did implicate "professional services" and thus was covered by the firm's professional liability policy. *Id.* Again, the similarities to the case at bar are striking, both in the centrality of the RESPA violation and in the specific allegations of wrongful "pricing" and failure to make required disclosures.

**[10]** More important for the purposes of our analysis, the *Burnet Title* decision appears to turn on the presence of disclosure violations in addition to allegations of mere overcharging. The *Burnet Title* court distinguishes *Medical Records* on this ground and states that "[t]he statutory obligation imposed upon real estate service providers to provide accurate information in settlement statements is distinct from the mere act of overcharging for services." *Id.* at 1065. This statement is equally pertinent to the case at bar. The *Baynham* complaint makes it clear that PMI's alleged sins are not limited to mere pricing decisions. PMI purportedly "acted in concert with its lenders" to violate disclosure duties and deceive the *Baynham* plaintiffs. The *Burnet Title* court also observes that, under *Haug v. Bank of America*, 317 F.3d 832, 838 (8th Cir. 2003), "RESPA does not directly target overcharging, but was intended to regulate the underlying business relationships and procedures of real estate service providers of which the costs are a function." 380 F.3d at 1065 (internal quotation marks omitted). Whatever else can be said about the alleged kickback scheme at issue here, it certainly concerns the "business relationships and procedures of real estate service providers," and thus implicates the core RESPA policy values vindicated in *Burnet Title*.

One superficially contrary precedent is presented by *Gregg & Valby L.L.P. v. Great American Ins. Co.*, 316 F. Supp. 2d 505 (S.D. Tex. 2004), which holds that claims against a law-

yer alleging a fee splitting and kickback scheme in violation of RESPA did not qualify as claims stemming from "professional services" under the lawyer's professional malpractice policy. The significance of this case is limited, however, since (1) the insurance policy in *Gregg* featured a narrower definition of "professional services" (specifically limiting coverage to conduct committed in the insured's capacity as a lawyer) than the one at issue in the PMI case, (2) the court in *Gregg* was concerned exclusively with fee setting rather than disclosure violations or other non-pricing conduct, *id.* at 515 ("all claims in the underlying suits arose out of Plaintiff's billing and/or fee-setting"), and (3) the insured in *Gregg* was a lawyer holding a typical legal malpractice insurance policy rather than a mortgage insurer holding a more general professional services policy, with a consequent difference in expectations. The presence of a RESPA claim implicates the legitimate expectations of a mortgage insurer in purchasing professional liability insurance to a far greater extent than it would implicate the expectations of a lawyer purchasing malpractice insurance. While a mortgage insurer probably sees RESPA claims as one of the paradigmatic liabilities to be covered by the insurance, a lawyer has a very different core set of potential liabilities in mind. In short, *Gregg*'s ultimate implications for the case at bar are little different than the other professional malpractice insurance cases discussed above, notwithstanding the fact that the case happens to involve a RESPA claim.

The presence of a RESPA claim in the instant case does not automatically resolve the interpretive question before us. We do not go so far as to espouse a general rule that all professional liability policies presumptively cover damages arising from RESPA claims. Nonetheless, the fact that the *Baynham* action presented a RESPA claim adds support to PMI's contention that its losses should be covered. While the jurisprudence on this point is not controlling authority in this circuit, the federal courts have shown a tendency to favor coverage for RESPA claims under professional liability policies where,

as here, significant non-billing conduct is at issue. Moreover, the centrality of RESPA to the real estate industry in general (and the mortgage insurance industry in particular) supports PMI's claim as to its expectations in purchasing the insurance, and it suggests that, at least in this case, given the otherwise broad language of the PMI policy, any exclusion of RESPA claims from coverage should have been explicitly articulated. This pro-coverage bias seems all the more appropriate in the instant case since it is in line with California's general policy of interpreting all policy ambiguities in favor of the insured.

## IV.  CONCLUSION

The plain text of the PMI policy and the basic principles of insurance policy interpretation under California law support a finding of coverage; and the implications of prevailing case law on professional malpractice policies — while only indirectly relevant — do not compel a contrary result. We therefore hold that PMI's losses stemming from the *Baynham* action are covered by the policy as arising from alleged Wrongful Acts in the rendering of Professional Services as those terms are defined in the policy. The fact that the *Baynham* claim alleges a RESPA violation, while not determinative, bolsters this conclusion. The rulings of the district court are therefore REVERSED and the case REMANDED with instructions to enter partial summary judgment in favor of PMI.