SIXTH DIVISION
March 19, 2010

1-09-0502

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY,<br>    Plaintiff-Appellee,<br><br>        v.<br><br>DONALD T. BERTUCCI, LTD., and DONALD T. BERTUCCI,<br>    Defendants-Appellants<br><br>(Lourdes Rodriguez,<br>    Defendant). | ) Appeal from<br>) the Circuit Court<br>) of Cook County<br>)<br>) 07 CH 25529<br>)<br>)<br>) Honorable<br>) Nancy J. Arnold,<br>) Judge Presiding<br>) |

JUSTICE McBRIDE delivered the opinion of the court:

This is an insurance coverage dispute involving a lawyer's professional liability policy and allegations that counsel retained an excessive amount of attorney fees from the settlement proceeds of a medical malpractice action. The lawyer has been sued in state court and named in attorney disciplinary proceedings. On cross-motions for summary judgment, the circuit court of Cook County found the insurer owed no duty to defend or cover the lawsuit, but owed coverage in the disciplinary action. Both sides appeal.

The construction of an insurance contract and a determination of the rights and obligations of the contracting parties are questions of law and suitable for resolution by summary judgment. *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 58, 514 N.E.2d 150, 166 (1987). We address the trial court's determinations *de novo*. *Pekin Insurance Co. v. Wilson*, 391 Ill. App. 3d 505, 509-10, 909 N.E.2d 379, 385 (2009) (construction of insurance policy is reviewed *de novo*); *City of Collinsville v. Illinois Municipal League Risk Management Ass'n*, 385 Ill. App. 3d 224, 229, 904 N.E.2d 70, 75 (2008) (entry of summary judgment is reviewed *de*

*novo*).

In order to determine whether the insured has a duty to defend the insured, we consider the allegations of the underlying pleadings and compare those allegations to the relevant provisions of the insurance contract. *Pekin Insurance Co.*, 391 Ill. App. 3d at 510, 909 N.E.2d at 385. If the facts alleged in the underlying complaint fall within or potentially within the policy's coverage, the insurer is duty bound to defend. *Pekin Insurance Co.*, 391 Ill. App. 3d at 510, 909 N.E.2d at 385. The threshold a complaint must meet to present a claim for potential coverage and raise a duty to defend is minimal, and any doubts are to be resolved in favor of the insured. *City of Collinsville*, 385 Ill. App. 3d at 230, 904 N.E.2d at 75-76.

On May 11, 2007, Continental Casualty Company (Continental Casualty), the plaintiff in this insurance coverage dispute, issued a $2 million lawyers professional liability policy to Chicago attorney Donald T. Bertucci and his solo law practice, on a claims-made-and-reported basis. The written contract tendered for our consideration specifies that all words and phrases appearing in bold font are defined in the contract. The "INSURING AGREEMENT" of the policy indicates there is "Coverage" for "all sums in excess of the [$5,000] deductible that the **Insured** shall become legally obligated to pay as **damages** and **claim expenses** because of a **claim** that is both first made against the Insured and reported in writing to the **Company** during the **policy period** by reason of any act or omission in the performance of **legal services** by the **Insured**."

The policy defines "**Claim**" as "a demand received by the **Insured** for money or services arising out of an act or omission, including **personal injury**, in the rendering of or failure to

2

render **legal services**." "**Legal services**" are "those services performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or as a notary public." "**Damages**" are limited to "judgments, awards and settlements" and do not include "legal fees, costs and expenses \*\*\* charged by the **Insured** \*\*\* and injuries that are a consequence of any of the foregoing." "**Claim expenses**" consist of "fees charged by attorneys designated by the **Company** or by the **Insured** with the **Company**'s written consent" and "all other all other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim** if incurred by the **Company**, or by the **Insured** with the written consent of the **Company**."

The section of the contract concerning the policy's limits of liability and deductible, indicates "[a]lthough not [considered] **Damages**," the Company will make "Supplementary payments" "up to $10,000.00 for any **Insured** and in the aggregate for attorney fees and other reasonable costs, expenses, or fees \*\*\* resulting from a **Disciplinary Proceeding** \*\*\* arising out of an act or omission in the rendering of **legal services** by such **Insured**." Again, "**legal services**" consist of "those services performed by an **Insured** for others as a lawyer, arbitrator, mediator, title agent or as a notary public." Further, "In the event of a determination of **No Liability** of the **Insured** against whom the **Disciplinary Proceeding** has been brought, the **Company** shall reimburse such **Insured** for Disciplinary Fees, including those in excess of the $10,000 cap set forth above, up to $100,000."

A few weeks after purchasing the policy, Bertucci requested defense and coverage of a lawsuit filed against him by a woman he represented in a medical malpractice case that settled in 2002 for $2.25 million, Rodriguez v. Illinois Masonic Medical Center and Curtis Whisler, M.D.,

1-09-0502

No. 97-L-16741. Bertucci characterized the suit against him, Rodriguez v. Bertucci, No. 07-L-06247, as a claim for damages as defined by the insuring agreement. He subsequently requested defense and coverage of related proceedings being conducted by the Attorney Registration and Disciplinary Commission (ARDC), Donald Thomas Bertucci, in relation to Lourdes Rodriguez, No. 07-CI-2293.

According to the verified pleading filed in state court and correspondence sent to the disciplinary agency, Bertucci's former client, Lourdes Rodriguez, is a native Spanish speaker with little formal education, who returned to Mexico while her medical malpractice suit was pending. She did not take issue with Bertucci's handling of her claim or with the settlement figure he secured. But based on Bertucci's retention of $750,000 of the proceeds and subsequent representation about his right to retain them, Rodriguez brought claims of breach of contract, unjust enrichment, conversion, breach of fiduciary duty, fraud, and violation of the Illinois statute which limits contingent legal fees in medical malpractice actions, section 2-1114 of the Code of Civil Procedure. 735 ILCS 5/2-1114 (West 1996). The statute, which took effect in 1985, limits the total contingent fee for a plaintiff's attorney or attorneys in a medical malpractice action to 33.33% of the first $150,000 of the sum recovered, 25% of the next $850,000, and 20% of any amount over $1 million. 735 ILCS 5/2-1114(a) (West 1996). The statute also provides that, "[i]n special circumstances, where an attorney performs extraordinary services involving more than usual participation in time and effort the attorney may apply to the court for approval of additional compensation." 735 ILCS 5/2-1114(c) (West 1996). Rodriguez alleged that the fee statute and her written agreement with Bertucci executed on December 23, 1996, limited his

4

compensation to no more than $512,500, and that he had taken an additional $237,500 without getting her consent and the court's approval. Furthermore, he had given her an amended settlement statement in which he "represented and implied" that he had obtained judicial approval for the enhanced fees. She began to uncover his misconduct when she returned to Chicago in approximately June 2006 for further medical treatment and was advised by the medical provider that she still owed money for her previous care -- services which Bertucci told her had been satisfied from the settlement proceeds. She telephoned Bertucci, and when his initial reaction was to use profanity and exclaim "what are you doing in Chicago?" she became suspicious and reviewed her records. She further alleged that she retained new attorneys who telephoned and corresponded with Bertucci several times in April and May 2007, but Bertucci did not explain the discrepancy or return the unauthorized fees to Rodriguez. Her new attorneys sent a letter to the ARDC which referenced their mandatory duties to report attorney misconduct, outlined Rodriguez's concerns, and indicated they had been in communication with Bertucci but had not received a satisfactory response. See *In re Himmel*, 125 Ill. 2d 531, 533 N.E.2d 79 (1988) (lawyer suspended one year for failure to report his unprivileged knowledge of an attorney's conversion of client's settlement funds). A few days after counsel notified the ARDC, Rodriguez asked the agency to investigate the matter and substitute her name as the complainant. The state court action was filed after that, seeking the unauthorized fees, interest accruing as of the settlement on February 12, 2002, her new legal expenses, and in the four equitable counts, punitive damages. See 815 ILCS 205/2 (West 1998) (authorizing equitable award of 5% prejudgment interest); see also *Krantz v. Chessick*, 282 Ill. App. 3d 322, 668 N.E.2d 77 (1996)

1-09-0502

(former client entitled to prejudgment interest on settlement proceeds).

Continental Casualty denied coverage for the two proceedings. It then filed this action to obtain a judicial declaration of the parties' rights and obligations under the policy, Bertucci counterclaimed, and as summarized above, on cross-motions for summary judgment, the circuit court ruled in part for Continental Casualty and in part for Bertucci. The court ruled there was no coverage for the civil action because it did not seek "**damages**" as that term was defined in the policy; however, the ARDC investigation was a "**Disciplinary Proceeding \*\*\*** arising out of an act or omission in the rendering of **legal services**" which triggered the policy's "Supplementary payments" obligation of up to $10,000 for attorney fees and other expenses, and additional reimbursement up to $100,000 upon Bertucci's vindication.

In pursuit of coverage for the civil action, appellant Bertucci raises two contentions. He first argues that Continental Casualty prevailed in the trial court by mischaracterizing the former client's lawsuit as a fee dispute, which is outside the scope of coverage. He contends his professional liability coverage was triggered because Rodriguez alleged he committed an error or omission while representing her, when despite having her authorization to retain $750,000 of her settlement proceeds, he failed to comply with the statutory requirement that he also obtain court approval for retaining enhanced fees for providing extraordinary services in a medical malpractice action. See 735 ILCS 5/2-1114(c) (West 1996). He also contends that settling a malpractice matter, paying outstanding liens, and distributing the remaining settlement funds to the client is a traditional, customary, and ordinary function "performed by an **Insured** for others as a lawyer," and, therefore, was the rendering of "**Legal services**" within the meaning of the

6

policy. He further contends that *Continental Casualty Co. v. Law Offices of Melvin James Kaplan*, 345 Ill. App. 3d 34, 801 N.E.2d 992 (2003), an Illinois case involving the same insurer and identical contract language, is factually similar, but the circuit court erroneously rejected it and chose to rely on a California case which is distinguishable, *Tana v. Professionals Prototype I Insurance Co.*, 47 Cal. App. 4th 1612, 55 Cal. Rptr. 2d 160 (1996).

Continental Casualty responds that the court ruled correctly that there is no coverage for the Rodriguez civil action because the insuring agreement covers "**damages**" but the suit concerns "**legal fees**" and "injuries that are a consequence [thereof]," which are outside the scope of the policy. The insurer also emphasizes that coverage is limited to "an act or omission in the performance of **legal services** by the **Insured**," which are defined as "those services performed by an **Insured** for others as a lawyer," and that Bertucci's retention of excessive fees was in no one's interest but his own and had nothing to do with the practice of law.

Insurance contracts are subject to the same rules of construction as are applicable to other types of contracts. *Cincinnati Insurance Co. v. Gateway Construction Co.*, 372 Ill. App. 3d 148, 151, 865 N.E.2d 395, 398 (2007). When construing a contract, the court's primary objective is to ascertain the true intent of the parties as expressed in their written agreement. *Cincinnati Insurance Co.*, 372 Ill. App. 3d at 151, 865 N.E.2d at 398. Accordingly, the court reads the contract as a whole, giving effect to every provision and taking into account the type of insurance, the nature of the risks undertaken, and the overall purpose of the policy. *Cincinnati Insurance Co.*, 372 Ill. App. 3d at 151-52, 865 N.E.2d at 398-99. Terms used are given their plain, ordinary, and generally accepted meaning, unless the contract indicates in some way that

particular definitions are used to replace that meaning. See, *e.g.*, *Sims v. Allstate Insurance Co.*, 365 Ill. App. 3d 997, 1001, 851 N.E.2d 701, 704 (2006). Definite and clear provisions, upon which the risk and premium calculations of the insurer were based, must be enforced as stated, unimpaired by ill-considered or unreasonable interpretation. *Sims*, 365 Ill. App. 3d at 1001, 851 N.E.2d at 704.

The complaint and plain, unambiguous language of the policy lead us to find that the insurer's interpretation of the coverage is the only reasonable one. The first numbered paragraph in Bertucci's professional liability contract contains the "INSURING AGREEMENT." An insuring agreement is "[a] provision of an insurance policy *** reciting the risk assumed by the insurer and establishing the scope of the coverage." Black's Law Dictionary 811 (7th ed. 1999). This particular insuring agreement expressly limits the scope of coverage to legal proceedings which allege both covered "damages" *and* "an act or omission in the performance of legal services." The state court action does not meet either requirement for coverage.

"Damages" are defined in the policy as "judgments, awards and settlements" and they "do not include" "legal fees *** charged by the **Insured**, no matter whether claimed as restitution of specific funds, forfeiture, financial loss, set-off or otherwise, and injuries that are a consequence of any of the foregoing." Rodriguez's legal action indisputably seeks (1) restitution for legal fees which Bertucci improperly charged against her settlement proceeds from the medical malpractice case and (2) consequential expenses for his impropriety, including statutory interest and her new attorney fees, as well as punitive damages. Therefore, the Rodriguez action alleges only noncovered, direct and consequential injuries from the excessive legal fees Bertucci charged

against her assets; it does not allege "damages" within the meaning of the policy.

Our opinion is influenced by California, Idaho, and Massachusetts cases which analyze similar attorney-client disputes and conclude the injuries are not the type covered by the attorney's professional liability insurance.

The client in *Tana* filed a complaint alleging his San Francisco attorney misrepresented or failed to explain a fee-splitting agreement in litigation with an entity known as Kikkoman and expected unconscionably high bonuses from his $7.6 million settlement proceeds. *Tana*, 47 Cal. App. 4th at 1617-18, 55 Cal. Rptr. 2d at 163. Faced with competing claims to the $7.6 million, the Kikkoman defendant deposited the money with the court. *Tana*, 47 Cal. App. 4th at 1615, 55 Cal. Rptr. 2d at 161. The client sued for declaratory relief and indemnification, compensatory damages, attorney fees, and punitive damages from his former attorney. *Tana*, 47 Cal. App. 4th at 1618, 55 Cal. Rptr. 2d at 163. The attorney's professional liability insurer declined to defend him, in part because the only damages the client sought pertained to the legal fees. *Tana*, 47 Cal. App. 4th at 1618, 55 Cal. Rptr. 2d at 163. Interpreting the same contract language at issue here, the court agreed, reasoning:

"A commonsense reading of the complaint reveals that it
was entirely a fee dispute, not a malpractice claim. [The client] did
not complain of anything [the attorney] did or failed to do in
representing him in the Kikkoman litigation. *** [The client
alleged acts or omissions with respect to attorney fees only. All of
the damages the client sought were either the return of or reduction

9

of attorney fees, or were in some way a consequence of those fees.]

***

Even if [the client] might have been seeking [compensatory damages and attorney fees, which are] more than just a reduction in his attorney's fee liability, [the attorney arguing for coverage] cannot avoid the inevitable conclusion that such damages are 'injuries' caused by (i.e., 'a consequence of') a dispute over legal fees.  Fee disputes do not become covered damages merely because the damages are called 'compensatory' or are sought under a claim of 'negligence' or 'breach of fiduciary duty.'  [Citation.]  Reading the complaint as a whole, it is clear the relief [the client] seeks is limited to a judicial resolution of the fee dispute, indemnity from payment of fees, and damages and costs associated with the controversy."  *Tana*, 47 Cal. App. 4th at 1617-18, 55 Cal. Rptr. 2d at 163.

Accordingly, the California court found there was no possibility of coverage and therefore no duty to defend.  *Tana*, 47 Cal. App. 4th at 1619, 55 Cal. Rptr. 2d at 164.

Bertucci attempts to distinguish *Tana* by arguing Rodriguez is essentially alleging she was injured by his failure to comply with the Illinois statute regarding enhanced fees.  He contends that in contrast to *Tana*, his client complains that he "failed in the litigation to obtain a court order at the termination of litigation approving his enhanced fee."  In reality, however,

Tana's client complained that counsel "failed" at the same point in the litigation, following the successful negotiation and funding of the settlement, by claiming entitlement to an excessive portion of the settlement dollars. Bertucci also contends that because Rodriguez refers to the statute, her suit is really about an error or omission in his representation of her as a client, rather than a disagreement about his compensation. Continental Casualty correctly points out, however, that the cited statute concerns legal fees only and has nothing to do with client representation in a medical malpractice action. The statute is entitled "Contingent *fees for attorneys* in medical malpractice actions." Emphasis added. 735 ILCS 5/2-1114 (West 1996). In its entirety, the statute provides:

"Contingent fees for attorneys in medical malpractice actions. (a) In all medical malpractice actions the total contingent fee for plaintiff's attorney or attorneys shall not exceed the following amounts:

33 1/3 % of the first $150,000 of the sum recovered;

25% of the next $850,000 of the sum recovered; and

20% of any amount recovered over $1,000,000 of the sum recovered.

(b) For purposes of determining any lump sum contingent fee, any future damages recoverable by the plaintiff in periodic installments shall be reduced to a lump sum value.

(c) The court may review contingent fee agreements for

fairness. In special circumstances, where an attorney performs extraordinary services involving more than usual participation in time and effort the attorney may apply to the court for approval of additional compensation.

(d) As used in this Section, "contingent fee basis" includes any fee arrangement under which the compensation is to be determined in whole or in part on the result obtained." 735 ILCS 5/2-1114 (West 1996).

Allegations of Bertucci's violation of a statue dealing exclusively with legal fees are allegations about "**legal fees** *** paid or incurred or charged by the **Insured**" or "injuries that are a 'consequence of' [legal fees paid or incurred or charged by the Insured]." Under a reasonable construction of the policy and complaint, the injuries alleged are not "damages" within the scope of the insuring agreement.

Like Bertucci, the personal injury attorney named in the Idaho case *Continental Casualty Co v. Brady*, 127 Idaho 830, 832, 907 P.2d 807, 809 (1995), successfully negotiated a settlement for his clients, following the near drowning of their son. However, the $393,000 settlement proceeds were divided in such a manner that only $216,930 was attributed to the personal injury claim addressed by their fee agreement. *Brady*, 127 Idaho at 832, 907 P.2d at 809. The remaining $176,070 was for a different claim and arguably belonged entirely to the clients, until, the day after the settlement, when the attorney persuaded them to enter into a second fee agreement entitling him to $122,500 of the $176,070. *Brady*, 127 Idaho at 832, 907 P.2d at 809.

12

1-09-0502

Upon reflection, the clients filed a five-count lawsuit in Idaho state court, alleging the second fee agreement was unenforceable, amounted to breach of fiduciary duty, unjust enrichment, and violation of the Idaho Consumer Protection Act, and also warranted punitive damages. *Brady*, 127 Idaho at 833, 907 P.2d at 810. The attorney seeking coverage argued the complaint went beyond a mere fee dispute, because it addressed the consumer protection statute and his fiduciary duty, in addition to the claims directly concerning the enforceability or actual terms of the second fee contract. *Brady*, 127 Idaho at 833, 907 P.2d at 810. He also argued that because, under his reading of the original fee agreement, the clients were entitled to only a portion of the $122,000 they were claiming in damages as a return of fees, the excess must represent damages beyond a return of fees. *Brady*, 127 Idaho at 833, 907 P.2d at 810. The court rejected this argument, stating:

> "If the party is requesting a 'return of fees,' it is immaterial what the actual theory of recovery is since the [lawyer's professional liability] policy flatly excludes 'all claims' for the return of fees. [Citation.] Furthermore, whether the [clients] are actually entitled to recover $122,000 is not the issue. The issue is simply whether this amount represents fees paid to [the attorney].
>
> ***
>
> [Ultimately], all of the factual allegations in the complaint center on a dispute over attorney fees, and the $122,000 sum requested as damages is tied directly to that fee dispute. ***

13

>In short, with the exception of the claim for punitive damages [which is excluded from coverage under the policy], the Duvalls' complaint simply does not support a claim for any damages unrelated to the return of fees."  (Emphasis omitted.)

*Brady*, 127 Idaho at 833-34, 907 P.2d at 810-11.

The language excluding the " 'return of fees' " in *Brady* appeared in the policy's exclusions section, instead of in the insuring agreement.  *Brady*, 127 Idaho at 832, 907 P.2d at 809.  The effect of the language is the same, however, regardless of where it appears in the insurance contract.  Continental Casualty has also correctly noted that the *Brady* exclusion was narrower and only excluded " 'return of fees' " from coverage (*Brady*, 127 Idaho at 832, 907 P.2d at 809), in contrast to the broader language at issue here, which precludes coverage for "legal fees *** charged by the Insured" and "injuries which are a consequence thereof."

Like the courts in *Tana* and *Brady*, we compare the language of the policy with the facts alleged in the complaint, rather than examine whether the client has pled any particular theory of relief such as the attorney's breach of a legal duty, violation of a statute, or disregard for an equitable duty.  *Pekin Insurance Co.*, 391 Ill. App. 3d at 510-11, 909 N.E.2d at 385 (where intentional infliction of emotional distress, assault, and battery were repled in negligence terms in attempt to trigger coverage, court disregarded plaintiff's labeling and found facts alleged were inconsistent with negligence); *Norman Shabel, P.C. v. National Union Fire Insurance Co.*, 923 F. Supp. 681, 683-84 (D. N.J. 1996) (where attorney allegedly failed to give client correct percentage of settlement, court disregarded assorted legal theories pled by client, focused on

nature of claim, which was retention of excessive legal fees, and found claim was not covered); *Gregg & Valby, L.L.P. v. Great American Insurance Co.*, 316 F. Supp. 2d 505, 512-13 (S.D. Tex. 2004) (where real estate closing documents misrepresented amount of attorney fees to be paid to law firm, characterizing the firm's fee-setting and billing practices as legal work or advice would not conceal true nature of claim, court found no coverage). Upon doing so, we conclude that Rodriguez's lawsuit is a fee dispute and does not allege "damages" within the meaning of the policy Bertucci obtained from Continental Casualty Company.

The Rodriguez lawsuit not only fails to alleged covered "damages," it also fails to allege "an act or omission in the performance of **legal services** by the **Insured**" within the meaning of the insuring agreement. According to the policy's definitions section, legal services are "those services performed by an Insured for others as a lawyer, arbitrator, title agent or as a notary public." Bertucci's retention of money cannot be construed as the provision of any type of service for another person and is a business practice independent of the lawyer-client relationship.

In *Gregg & Valby*, a Texas court rejected the contention that a law firm's misconduct with respect to its fees were client services. *Gregg & Valby*, 316 F. Supp. 2d 505. The legal malpractice policy at issue covered "Professional services," which were defined as " 'services you perform for a client in your capacity as: (a) a lawyer; (b) a mediator or arbitrator; (c) a notary public; or (d) as an administrator, conservator, executor, guardian trustee, receiver, or in any similar capacity. ' " *Gregg & Valby*, 316 F. Supp. 2d at 510-11. Practically speaking, this definition is identical to the definition operating here. The Houston firm was hired to draft forms

15

for two mortgage lenders to use at real estate closings. *Gregg & Valby*, 316 F. Supp. 2d at 511. The prepared forms indicated the firm would receive a $175 document preparation fee, but the firm had allegedly agreed to share the collected fees with the mortgage lenders, in violation of federal laws prohibiting fee-splitting and kickbacks in real estate settlements involving federal funds and requiring truth in lending. *Gregg & Valby*, 316 F. Supp. 2d at 511. The firm was named in two class-action lawsuits and sought defense and coverage from its legal malpractice insurer, arguing that the alleged wrongdoing occurred early on when the lawyers drafted the forms and advised the mortgage lenders on the legality of the fee-sharing arrangement. *Gregg & Valby*, 316 F. Supp. 2d at 512. The court rejected the contention that the suits concerned legal work or advice, pointing out that "the home buyers did not complain about the amount of the 'Document Preparation Fee,' nor its existence, but only what happened to that fee after it was paid at closing." *Gregg & Valby*, 316 F. Supp. 2d at 513.

After boiling the allegations down to the facts and determining they concerned the law firm's fee-setting and billing practices only, the court considered whether the actions were "professional services" triggering coverage under the policy. *Gregg & Valby*, 316 F. Supp. 2d at 513. The court consulted considerable authority and concluded professional services within the context of insurance contracts were only " 'those acts which use the inherent skills *typified* by that profession, not *all* acts associated with the profession.' " (Emphasis in original.) *Gregg & Valby*, 316 F. Supp. 2d at 513, quoting *Atlantic Lloyds Insurance Co. of Texas v. Susman Godfrey, L.L.P.*, 982 S.W.2d 472, 477 (Tex. App. 1998).

"When determining whether a particular act is a 'professional

16

service,' the court 'must look not to the title or character of the party performing the act, but the act itself.' [Citation.] Thus, even tasks performed by lawyers are not considered 'professional services' if they are ordinary activities that can be completed by those lacking legal knowledge and skill." *Gregg & Valby*, 316 F. Supp. 2d at 513, citing *Atlantic Lloyd's*, 882 S.W.2d at 476-77.

See also *Marx v. Hartford Accident & Indemnity Co.*, 183 Neb. 12, 13, 157 N.W.2d 870, 872 (1968) (indicating the "widely accepted" standard when determining whether a particular act is a professional service is to look to the act itself, not the title or character of the party performing it); *Medical Records Associates, Inc. v. American Empire Surplus Lines Insurance Co.*, 142 F.3d 512, 515 (1st. Cir. 1998) (concluding professional services are "activities that distinguish a particular occupation from other occupations -- as evidenced by the need for specialized learning or training -- and from the ordinary activities of life and business"). The Texas court found no indication that the Houston law firm's billing or fee-setting required legal skill or knowledge, or was specific to the legal profession. *Gregg & Valby*, 316 F. Supp. 2d at 513. Instead, setting a price and billing the client were "merely administrative tasks inherent to all businesses." *Gregg & Valby*, 316 F. Supp. 2d at 514.

The billing/professional services dichotomy also appears in *Reliance National Insurance Co. v. Sears, Roebuck & Co*, 58 Mass. App. 645, 792 N.E.2d 145 (2003), a Massachusetts case involving an attorney who billed his client for legal services that were never performed. The client did not realize the discrepancy until it had overpaid $833,409. *Reliance National*, 58

Mass. App. Ct. 646, 792 N.E.2d at 146. It sued for an accounting and to recover the legal fees and its consequential legal fees and costs. *Reliance National*, 58 Mass. App. at 646, 792 N.E.2d at 146. The lawyer's professional liability policy covered claims " 'caused by any act, error, or omission of the insured ... which arise[s] out of the rendering or failure to render *professional services* for others in the insured's capacity *as a lawyer*.' " (Emphasis in original.) *Reliance National*, 58 Mass. App. at 646-47, 792 N.E.2d at 147. Predictably, the Massachusetts court found that billing a client for legal services did not implicate the legal malpractice policy:

> "[Professional acts or services require] specialized knowledge and skill that is acquired through rigorous intellectual training. [Citation.] The setting for the intellectual training is often an academic one, as in architectural school, engineering school, law school, or medical school.
>
> Against those criteria we decide that the billing function of a lawyer is not a professional service. Billing for legal services does not draw on special learning acquired through rigorous intellectual training. We are not aware that courses in billing clients appear in law school curricula. The billing function is largely ministerial. There are elements of experience and judgment in billing for legal services, but the same goes for pricing shoes. As billing is not a professional service, it does not come with the coverage of a professional liability insurance policy ***."

1-09-0502

*Reliance National*, 58 Mass. App. at 648, 792 N.E.2d at 148.

It has also been observed:

> "The professional aspect of a law practice obviously involves the
> rendering of legal advice to and advocacy on behalf of clients for
> which the attorney is held to certain minimum professional and
> ethical standards. [This is distinct from the] *** commercial
> aspect [of a law practice, which] involves the setting up and
> running of a business, i.e., securing office space, hiring staff,
> paying bills and collecting on accounts receivable ***." *Harad v.
> Aetna Casualty & Surety Co.*, 839 F.2d 979, 985 (3rd Cir. 1988).

See also *Sullivan v. Bickel & Brewer*, 943 S.W.2d 477, 481 (Tex. App. 1995) (indicating a cause of action for legal malpractice arises out of an attorney's bad legal advice or improper representation of a client).

Turning again to the allegations against Bertucci, it is apparent that Rodriguez's claims concern ordinary, nonlegal services rather than "an act or omission in the performance of legal services by the Insured" within the meaning of the insuring agreement. Moreover, as we suggested above, we do not find that Bertucci's actions were "performed by an Insured *for others as a lawyer*." In our assessment, to construe the policy to cover Bertucci's retention of an excessive amount of attorney fees would expand the insurance coverage beyond what was reasonably contemplated by the parties at the time of contracting. In bargaining for professional liability insurance coverage, Bertucci could legitimately expect that he would be covered for acts

19

or omissions in the course of representing his clients but would not be covered with respect to fee arrangements and other business disputes. *Cincinnati Insurance Co.*, 372 Ill. App. 3d at 151-52, 865 N.E.2d at 398-99 (in order to construe intent at the time of contracting, a court reads the policy as a whole, giving effect to every provision, and taking into account the type of insurance, the nature of the risks undertaken, and the overall purpose of the policy).

Moreover, we find the case Bertucci relies upon readily distinguishable in that the alleged negligence in *Kaplan* arose during the core representation of the client, when a bankruptcy lawyer failed to obtain judicial discharge of his client's prepetition debts, namely the attorney fees the client owed for legal services rendered prior to the filing of the bankruptcy petition. *Kaplan*, 345 Ill. App. 3d at 37, 801 N.E.2d at 994. In that case, the claim against the lawyer clearly arose from an act or omission in the rendering of legal services and was alleged to be a consequence of negligence in performing those services. In that case, counsel was retained to do a job and was sued for failing to do it properly. In contrast, it is alleged in Rodriguez v. Bertucci, No. 07-L-06247, that Bertucci was retained to file and litigate a case on Rodriguez's behalf and that he effectively performed those services. Rodriguez has not made any accusations about the legal services Bertucci rendered: she has not criticized his preparation or timely filing of the medical malpractice pleading, she has not questioned his discovery efforts, she has not challenged his choice of experts, she has not taken issue with his case management, and she has not disputed the negotiation efforts that ultimately brought the case to a successful conclusion. While in *Kaplan* the claim arose because the lawyer incorrectly performed the task he was hired to perform in the bankruptcy court, the claim in the lawsuit at issue arose only after the lawyer

20

correctly completed the task he was hired to perform. Thus, we reject Bertucci's contention that there is no meaningful distinction between the *Kaplan* dispute and the lawsuit pending against Bertucci in the circuit court of Cook County.

Bertucci's second main argument regarding the *Rodriguez* action is that the policy's dishonesty exclusion contains an exception that is a stand-alone grant of coverage to attorneys like himself who are defending accusations of a "dishonest, fraudulent, criminal, or malicious act or omission." He pled this theory in Count II of his counterclaim and unsuccessfully argued for summary judgment. He cites the following policy language:

> "IV. EXCLUSIONS
>
> This policy does not apply:
>
> A. to any **claim** based on or arising out of any dishonest, fraudulent, criminal or malicious act or omission by an **Insured** except that this exclusion shall not apply to **personal injury**. The Company shall provide the Insured with a defense of such claim unless or until the dishonest, fraudulent, criminal or malicious act or omission has been determined by any trial verdict, court ruling, regulatory ruling or legal admission, whether appealed or not. Such defense will not waive any of the **Company**'s rights under this policy. Criminal proceedings are not covered under this Policy regardless of the allegations made against the **Insured[.]**"

He contends that at least three of the five counts in Rodriguez's pleading include allegations that

are potentially within this coverage and trigger the insurer's duty to defend. More specifically, the conversion count includes the allegation, "32. Bertucci's actions were outrageous and constitute malice and oppression against Rodriguez." The breach of fiduciary duty count alleges, "27. Bertucci breached *** [the attorney-client duty by] paying himself the Unauthorized Fees without prior court approval or the approval of Rodriguez" and "28. *** by overreaching and taking advantage of his position." In addition, the fraud count alleges, "25. By preparing and delivering the Amended Settlement Statement to Rodriguez with the amount of THIRTY-THREE AND ONE-THIRD PERCENT (33 1/3%) presented as the correct attorney's fee, Bertucci [falsely] represented and implied that he had obtained a court's authority to the additional fees and was entitled to [the] additional fees." Bertucci concludes that if there is any ambiguity in the meaning of the dishonesty exception, it must be construed in favor of the insured and against the insurer. See *Continental Casualty Co., v. McDowell & Colantoni, Ltd.*, 282 Ill. App. 3d 236, 241, 668 N.E.2d 59, 62-63 (1996) (when an exclusionary clause is relied up on to deny coverage, it must be clear and free from doubt, and construed liberally in favor of the insured and strongly against the insurer).

Bertucci's argument fails because an exception to an exclusion does not create coverage or provide an additional basis for coverage, it only preserves coverage granted in the insuring agreement. *Stoneridge Development Co. v. Essex Insurance Co.*, 382 Ill. App. 3d 731, 756, 888 N.E.2d 633, 656 (2008). When the allegations do not fall within the scope of the insuring agreement, some courts are unwilling to even consider the applicability of any exclusions. *Stoneridge Development Co.*, 382 Ill. App. 3d at 756, 888 N.E.2d at 656. We nonetheless

consider it in light of the overriding principle to construe the policy as a whole (*Stoneridge Development Co.*, 382 Ill. App. 3d at 756, 888 N.E.2d at 656, citing *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1212 (1992)), but have little sympathy for the proposition. The argument gives inordinate emphasis to an isolated portion of one sentence, contrary to the principle that policy provisions are read in light of other relevant provisions and the contract as a whole. *Founders Insurance Co. v. Muñoz*, 389 Ill. App. 3d 744, 749, 905 N.E.2d 902, 908 (2009) (all the provisions of a contract, rather than its isolated parts, should be read together to interpret the parties' intent); *Outboard Marine*, 154 Ill. 2d at 108, 607 N.E.2d at 1212. A policy must not be interpreted in a manner that renders provisions of the contract meaningless. *Cincinnati Insurance Co.*, 372 Ill. App. 3d at 152, 865 N.E.2d at 399. The fact that Bertucci has suggested a creative possibility or that Continental Casualty Company disagrees with him does not mean the contract is ambiguous. *Young v. Allstate Insurance Co.*, 351 Ill. App. 3d 151, 157, 812 N.E.2d 741, 748 (2004). The relevant inquiry is whether the contract's provisions are subject to more than one *reasonable* interpretation. *Young*, 351 Ill. App. 3d at 157, 812 N.E.2d at 748. We will not distort the policy and create ambiguity where none exists. *Young*, 351 Ill. App. 3d at 157, 812 N.E.2d at 748. Bertucci's alternate interpretation is not reasonable. This contract's insuring agreement and the quoted exclusion expressly limit coverage to a "**claim**," claims are expressly defined in the policy as "act[s] or omission[s] \*\*\* in the rendering of or failure to render **legal services**," and we have already rejected the notion that Bertucci's alleged conduct involved "**legal services**."

For these reasons, we find that there was no possibility of coverage for the Rodriguez

civil action and we affirm the circuit court ruling to that effect.

On cross-appeal, Continental Casualty Company challenges the circuit court's determination that the ARDC proceeding triggered the policy's supplementary payments provision. Bertucci pled this theory in count III of his counterclaim. The supplementary payments provision expressly limits coverage to a "**Disciplinary Proceeding** \*\*\* arising out of an act or omission in the rendering of **legal services** by such **Insured**." The insurer argues that, like the civil case, the ARDC proceeding is not based on any wrongful acts committed in the performance of "legal services." Bertucci responds that the complaint before the ARDC, the sole body charged with the investigating and prosecuting claims against Illinois attorneys arising out of the representation of a client in a legal matter, is a "**Disciplinary Proceeding**" that arises from his practice of law, and is within the scope of the supplementary payments provision.

We again find the insurer's construction of the policy to be the only reasonable construction. As discussed above, this insuring agreement, which is the portion of the policy "reciting the risk assumed by the insurer or establishing the scope of the coverage" (Black's Law Dictionary 811 (7th ed. 1999)) precludes coverage for Bertucci's retention of excessive attorney fees from Rodriguez's settlement proceeds. The supplementary payments provision must be read within the context of this insuring agreement. In fact, the supplementary payments provision reiterates that coverage is limited to "**legal services**," which we know must be services that draw upon Bertucci's specialized knowledge and skill as a lawyer and are provided for others. Accordingly, we conclude the ARDC proceeding does not come within the terms of the policy and that Continental Casualty Company was entitled to judgment as a matter of law on count III

24

1-09-0502

of Bertucci's counterclaim.  The circuit court's ruling with respect to the supplementary

payments provision is reversed.

Affirmed in part and reversed in part.

CAHILL, P.J., and J. GORDON, J., concur.